**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| T.A.H., by and through his natural mother and guardian, Shardae Greer, and SHARDAE GREER, individually, | ) ) ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No.: 1:24-cv-00847 |
| | ) | |
| | ) | COMPLAINT |
| MEAD JOHNSON & COMPANY, LLC, | ) | |
| | ) | JURY TRIAL DEMANDED |
| SERVE: Illinois Corporation Service Co. 801 Adlai Stevenson Drive Springfield, IL 62703 | ) ) ) | |
| | ) | |
| And | ) | |
| | ) | |
| MEAD JOHNSON NUTRITION COMPANY | ) | |
| | ) | |
| SERVE: Illinois Corporation Service Co. 801 Adlai Stevenson Drive Springfield, IL 62703 | ) ) ) | |
| | ) | |
| *Defendants.* | ) | |

**PLAINTIFF'S COMPLAINT AND JURY DEMAND**

Plaintiff, Shardae Greer on behalf of T.A.H., a minor, (hereinafter "Plaintiff"), by and through undersigned counsel, by way of complaint against MEAD JOHNSON & COMPANY, LLC, and MEAD JOHNSON NUTRITION COMPANY (hereinafter "Defendants") alleges as follows upon information and belief:

**INTRODUCTION**

1.      This action arises out of the injuries suffered by Plaintiff's premature infant, who was fed Defendants' cow's-milk-based infant formula and/or fortifier. Necrotizing Enterocolitis (hereinafter "NEC") is a deadly intestinal disease characterized by inflammation and injury of the gut wall barrier that may advance to necrosis and perforation of the gut. Advanced cases of NEC may lead to surgery and to death. Significantly higher rates of NEC have been found in premature or preterm babies with low birth weights who are fed cow's milk-based formula or fortifier products. The companies who manufacture these products often intentionally mislabel and misrepresent the contents of the products both to the public at-large and to the health care community, passing off these deadly products as something similar to or even superior to human breast milk. Tragically, T.A.H., who was premature at birth, was fed these cow's milk-based products, developed NEC, and suffered significant injuries as a result.

2.      Plaintiff, Shardae Greer, as Parent and Natural Guardian of T.A.H., brings this cause of action against Defendants for claims arising from the direct and proximate result of Defendants' negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling, failure to warn, and/or sale of the Defendants' cow's milk-based products (hereinafter "Cow's Milk-Based Formula," "Cow's Milk-Based Fortifier," or collectively "Cow's Milk-Based Products").

**JURISDICTION AND VENUE**

3.      This is an action for damages which exceeds the sum of $75,000.00, exclusive of costs, interest, and attorneys' fees.

4.      This Court has jurisdiction over this case pursuant to 28 U.S.C. §1332, as complete diversity exists between Plaintiff and the Defendants, and the matter in controversy, exclusive of

interest and costs, exceeds the sum or value of $75,000.00.

5.    Per a stipulated agreement, the Parties have agreed that personal jurisdiction over the Mead Johnson Defendants is lacking in Illinois except to the extent that Plaintiff's alleged use of Mead Johnson products and resulting injuries occurred in Illinois.  However, per a stipulated agreement, the Parties agree that personal jurisdiction is proper in this Court for purposes of completing all pretrial proceedings.

6.    Venue is proper in this Court, under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district. The Parties, per a stipulated agreement, have further agreed that venue is proper in this Court for purposes of completing all pretrial proceedings in this Court.

## **PLAINTIFF**

3.    T.A.H. was born on October 24, 2015. T.A.H. was born prematurely at 24 weeks gestation weighing 785 grams at University of Rochester Medical Center – Strong Memorial Hospital in Rochester, New York.

4.    Starting on or about November 1, 2015, T.A.H. was fed Defendants' formula and fortifier products (Enfamil Premature Infant Formula – 24 Cal High Protein, Enfamil Premature Infant Formula – 24 Cal High Protein, Enfamil Premature Infant Formula – 30 Cal, and Enfamil Human Milk Fortifier Powder) while in the NICU.

5.    After being fed Defendants' products, T.A.H. developed stage III, surgical NEC on November 25, 2015.  He had exhibited bloody stools, abdominal distension, respiratory decompensation, pneumatosis intestinalis confirmed via imaging, clinical deterioration, and eventual sepsis indicating a necrotic process.

6.    On November 29, 2015, T.A.H. underwent the first of a total of six operative

procedures, including four exploratory laparotomies and two wound VAC dressing changes, which involved bowel resections, lyses of adhesions, washouts, an appendectomy, and ultimately the formation of a colostomy.

7.      This took place over an extended, six-month hospitalization, with T.A.H. finally being discharged on April 21, 2016, and later required an additional hospitalization with open surgery for colostomy reversal five months after discharge on September 26, 2016.

8.      At the time of T.A.H.'s injury, T.A.H.'s parents were unaware of the fact that the Defendants' Cow's Milk-Based Products T.A.H. was fed caused or substantially contributed to his development of NEC and ultimately to T.A.H.'s injury.

9.      At all relevant times, T.A.H. was domiciled in and a citizen of the State of New York and resides in Monroe County, New York.

10.     Plaintiff, Shardae Greer, the mother of T.A.H. (hereinafter "T.A.H.'s Mother"), is domiciled in and a citizen of State of New York and resides in Monroe County, New York. T.A.H.'s Mother brings this action to recover for T.A.H.'s injuries, which are the direct and proximate result of consumption of Defendants' unreasonably dangerous cow's milk-based preterm infant nutrition products.

## **DEFENDANTS**

11.     Defendant Mead Johnson & Company, LLC is a Delaware limited liability corporation with its principal place of business located at 2400 W. Lloyd Expwy., Evansville, Indiana 47721.

12.     Defendant Mead Johnson Nutrition Company is a Delaware corporation with its principal place of business located at 2400 W. Lloyd Expwy., Evansville, Indiana 47721.

13.     Defendants Mead Johnson & Company, LLC, and Mead Johnson Nutrition

4

Company (collectively "Mead") are companies based in Indiana that manufacture, design, formulate, prepare, test, provide instructions for, market, label, package, sell, and/or place into the stream of commerce in all fifty states, including New York, premature infant formula including Enfamil and Enfamil Human Milk Fortifiers, including Enfamil A+, Enfamil NeuroPro, Enfamil Enspire, and EnfaCare Powder.

14.     Defendant Mead Johnson Nutrition Company self-proclaims to be recognized as "a world leader in pediatric nutrition" and traces its history back to the company's founding in 1905 by Edward Mead Johnson, Sr. It claims to be the "only global company focused primarily on infant and child nutrition" and that its "singular devotion has made our flagship 'Enfa' line the leading infant nutrition brand in the world." Boasting "more than 70 products in over 50 countries," it claims that its "products are trusted by millions of parents and healthcare professionals around the world." It is this trust that Defendants Mead have intentionally exploited for their own pecuniary gain at the expense of vulnerable families throughout the United States and the world.

### FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

#### A. Necrotizing Enterocolitis

15.     According to the World Health Organization ("WHO"), babies born prematurely, or "preterm," are defined as being born alive before 37 weeks of pregnancy are completed, like C.G. The WHO estimates that approximately 15 million babies are born preterm every year and that this number is rising.

16.     Nutrition for preterm babies, especially those who have a very low birth weight (under 1500 grams) or extremely low birth weight (under 1000 grams), is significantly important. Since the United States ranks in the top ten countries in the world with the greatest number of

preterm births, the market of infant formula and fortifiers is particularly vibrant.

17.     Necrotizing Enterocolitis ("NEC") is a severe gastrointestinal disease in premature (preterm) infants ("infants"). The Centers for Disease Control and Prevention ("CDC") defines preterm birth as when a baby is born before the 37 weeks of full-term pregnancy have been completed.[1] In 2020 alone, preterm birth affected one out of every ten infants born in the United States.[2]

18.     NEC is the most common, and frequently dangerous, gastrointestinal emergency in premature infants in the NICU. It is also the most common cause of gastrointestinal-related death among the smallest, most premature infants in the NICU.[3]

19.     NEC occurs when tissue in the large intestine, also known as the colon, becomes inflamed.[4] This inflammation damages and kills tissue in the infant's colon.

20.     Signs and symptoms of NEC often include abdominal distension, hemorrhage and necrosis of tissue within the intestine, peritonitis,[5] intestinal perforation, discomfort, and death.[6]

21.     The NEC diagnosis is commonly determined with the use of Modified Bell's Staging Criteria, ranging from Stage IA (suspected NEC) to the most severe at Stage IIIB

---

[1]     Center for Disease Control and Prevention, *Preterm Birth,* https://www.cdc.gov/reproductivehealth/maternalinfanthealth-/pretermbirth.htm (last modified Nov. 1, 2021).

[2] *Id.* For context, in 2020, 3,605,201 babies were born in the United States, meaning that more than 360,000 of those babies were born prematurely—*close to 1,000 every day*. https://www.cdc.gov/nchs/data/vsrr/vsrr012-508.pdf

[3] Sheila M. Gephart, RN, BSN, *et al.*, *Necrotizing Enterocolitis Risk: State of Science*, 12 Advances in Neonatal Care 77-89 (2012).

[4]     Stanford Children's Health, *Necrotizing Enterocolitis in the Newborn*, *https://www.stanfordchildrens.org/en/topic/default?id=necrotizing-enterocolitis-90-P02388* (last visited Feb. 22, 2022).

[5] Peritonitis is defined as redness, swelling, and inflammation of the tissue that lines the abdomen.

[6] Anand RJ, *et al.*, *The Role of the Intestinal Barrier in the Pathogenesis of Necrotizing Enterocolitis,* 27 Shock 124–33 (2007).

(advanced, severely ill, perforated bowel).[7] The Modified Bell's Staging Criteria incorporate systemic, intestinal, and radiological signs to adequately diagnose, stage, and treat NEC.

22.     In some infants, NEC is mild. In others, however, symptoms are severe and life-threatening. Mild cases of NEC may be effectively treated by withholding enteral feeds,[8] decompressing the stomach with a nasogastric tube, and/or starting broad-spectrum antibiotics.[9]

23.     In advanced cases, however, NEC may lead to surgery, extensive intestinal necrosis, and death.[10] The mortality rate for NEC patients ranges from 10% to 50% and approaches 100% for patients with the most severe form of the disease.[11]

24.     If the infant survives the disease, the long-term outcomes present a multitude of health issues. Surgical NEC survivors are much more likely to have feeding difficulties and gastrointestinal ostomies from ages six months to 36 months than those without an NEC diagnosis.[12] NEC infants treated with non-surgical intervention are more likely to have a higher risk of failure to thrive, feeding difficulties, neurodevelopmental delay, and open gastrointestinal ostomies when they are between six and twelve months of age.[13]

---

[7] Josef Neu, MD, *Necrotizing Enterocolitis, The Search for a Unifying Pathogenic Theory Leading to Prevention*, 43 Pediatr. Clin. North. Am. 409–432 (1996), *https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7127724/*.

[8] Enteral feeding refers to intake of food through the gastrointestinal (GI) tract. The GI tract is composed of the mouth, esophagus, stomach, and intestines. Enteral feeding may mean nutrition taken through the mouth or through a tube that goes directly to the stomach or small intestine.

[9] PK, Rasiah SV, Ewer AK, *Necrotizing Enterocolitis: Current Perspectives*, 4 Res. Rep. Neonatal 31-42 (2014).

[10] *Id.*

[11] Holman RC, *et al.*, *Necrotizing Enterocolitis Hospitalizations Among Neonates in the United States*, 20 Paediatr Perinat Epidemiol, 498–506 (2006).

[12] Ganapathy V. Hay, *et al.*, *Long-term Healthcare Costs of Infants Who Survived Neonatal Necrotizing Enterocolitis: A Retrospective Longitudinal Study Among Infants Enrolled in Texas Medicaid*, 13 BMC Pediatrics 127 (2013).

[13] *Id.*; Rees CM, *et al.*, *Neurodevelopmental Outcomes of Neonates with Medically and Surgically Treated Necrotizing Enterocolitis*, 92 Arch. Dis. Child Fetal Neonatal Ed. 193–8 (2007).

**B. Bovine Formula Increases NEC Risk**

25.     Bovine milk is used to supplement infant formula.

26.     Bovine formula and/or fortifiers are non-prescription.  Thus, they do not require a physician's recommendation and are sold with packaging and labels designed to inform the average consumer.

27.     The Food and Drug Administration ("FDA") has issued guidance specifically for the labeling of infant formulas, stating, in pertinent part:

> Infant formulas are intended for a vulnerable population and may serve as a sole or primary source of nutrition for some infants during a critical period of growth and development. Caregivers of babies fed infant formula products must be able to trust that the information on the label is truthful, not misleading, and scientifically supported.

28.     Bovine formula and/or fortifiers are often given to infants enterally, and NEC only occurs after infants have been enterally fed.[14]  Several challenges exist for preterm nutritional support.  Many preterm infants, especially those born under 1500 grams and/or before 34 weeks gestation, are not able to breastfeed.[15]  The suck-swallow-breathe rhythm of oral feeding may not be possible for preterm infants because of coordination issues and/or low body stores of energy.[16]

29.     Premature infants have immature gastrointestinal systems, especially as compared to the gastrointestinal systems of term infants. The specific physiology of the preterm gastrointestinal system makes premature babies vulnerable to NEC: "The preterm gut is characterized by reduced peristalsis, a thin mucous layer, reduced tight junctions, increased enterocyte apoptosis, and impaired enterocyte regeneration. Decreased structural integrity and

---

[14] Siggers RH, *et al.*, *Nutritional Modulation of the Gut Microbiota and Immune System in Preterm Neonates Susceptible to Necrotizing Enterocolitis*, 22 J Nutr. Biochem 511-21 (2011).

[15] Jocelyn Shulhan, *et al.*, *Current Knowledge of Necrotizing Enterocolitis in Preterm Infants and the Impact of Different Types of Enteral Nutrition Products*, 8 Adv Nutr. 80–91 (2017).

[16] *Id*.

functionality of the gut result in poor digestion and absorption of energy, protein, and other nutrients necessary for growth, the development of organs, and immunoprotection."[17]

30.     Preterm infants' immune systems are also significantly different than those of term infants, which compounds their susceptibility to NEC when fed unsafe products: "[T]here are distinct differences between term and preterm infants in regard to the expression of immune cells and signaling pathways. A preterm immune system cannot readily detect pathogens and protect against infections due to multiple associated factors such as 1) the decreased production of IgA, IgM, IgG, and defensins; 2) changes in the expression of toll-like receptors (TLRs), especially TLR4 and TLR9, which are involved in pathogen recognition and the activation of the innate immune system; and 3) upregulation of proinflammatory TLRs and/or proinflammatory cytokines…. The culmination of these factors increases a preterm infant's vulnerability to infections and disease, particularly NEC."[18]

31.     When sufficient maternal breast milk is not available, it has been widely recognized that alternative sources of enteral nutrition for preterm or low birth weight infants include donor breast milk or artificial formula.

32.     Several studies establish that bovine formulas and/or fortifiers lead to a higher incidence of NEC in preterm infants than human milk does.[19] An exclusively human milk-based diet is associated with a lower rate of NEC than a diet of human milk and bovine-based products.

---

[17] *Id.*

[18] *Id.*

[19] *See* Chowning R., *et al.*, *A Retrospective Analysis of the Effect of Human Milk on Prevention of Necrotizing Enterocolitis and Postnatal Growth* 36 J Perinatol 221-4 (2016); Johnson TJ, et al., *Cost Savings of Human Milk as a Strategy to Reduce the Incidence of Necrotizing Enterocolitis in Very Low Birth Weight Infants*, 107 Neonatology 271–6 (2015); Sullivan, S., *et al.*, *An Exclusively Human Milk- Based Diet is Associated with a Lower Rate of Necrotizing Enterocolitis than a Diet of Human Milk and Bovine Milk-Based Products*, 156 J Pediatr 562–7 (2010); Cristofalo EA, *et al.*, *Randomized Trial of Exclusive Human Milk versus Preterm Formula Diets in Extremely Premature Infants,* 163 J Pediatr1592- 5 (2013).

33.     In 1990, a landmark study was published linking bovine formula to NEC.[20]  The authors conducted two parallel dietary studies, involving 926 very low birth weight infants.  In Study A, infants were randomly assigned to pasteurized banked donated breast milk or nutrient-enriched preterm formula. Randomization was stratified according to whether the mother provided breast milk for her own infant.  Thus, donor milk and preterm formula could be compared as sole diets in infants whose mothers did not provide their own milk or as a supplement to breast milk.  Study B compared standard term formula or the preterm formula as sole diets or as supplements to the mother's milk.  All infants with NEC had received enteral feeds.  NEC developed in 51 of the 926 preterm infants (5.5%). Of those confirmed cases, 35% needed surgery and 26% died.  Of the 86 infants exclusively fed donor breast milk, there were three cases (4%) of NEC, and among the 76 infants fed exclusively preterm formula, there were six cases (8%) of NEC.  NEC was determined to be *six to ten times* more common in those fed bovine-based formula, and *three times* more common than in those who received the formula plus breast milk.

34.     The effects of human milk versus formula feeding were evaluated in another study, published in 1999.[21]  That study specifically compared outcomes of 62 infants fed fortified human milk, which was defined as the mother's own milk plus Similac and/or Similac Neosure Human Milk Fortifier.  46 infants were fed exclusively the preterm formula Similac and/or Similac Neosure Premature Formula 24.  The study found that infants fed with any amount of human milk were discharged earlier than infants fed preterm formula, despite significantly slower rates of weight gain and size. In addition, there was lower incidence of NEC and late onset of sepsis in infants fed fortified human milk as compared to those fed preterm formula.  The study concluded that the

---

[20] Lucas A., Cole TJ, *Breast Milk and Neonatal Necrotizing Enterocolitis*, 336 Lancet 1519-1523 (1990).

[21] Schanler RJ, *et al.*, *Feeding Strategies for Premature Infants: Beneficial Outcomes of Feeding Fortified Human Milk vs Preterm Formula*, 103 Pediatrics 1150-57 (1999).

unique properties of human milk promote an improved host defense and gastrointestinal function compared with the feeding of formula.

35.     Another study was published in 2010, evaluating the benefits of an exclusively human milk-based diet compared with a diet of both human milk and bovine milk-based products in extremely premature infants.[22]  Infants fed their own mothers' milk were separated into three different study groups: (1) HM100: pasteurized donor human milk-based human milk fortifier with an enteral intake of 100 mL/kg/d; (2) HM40: pasteurized donor human milk-based human milk fortifier with an enteral intake of 40 mL/kg/d; and (3) BOV: bovine milk-based human milk fortifier with an enteral intake of 100 mL/kg/d.  The groups receiving an exclusively human milk diet had significantly lower rates of NEC and NEC requiring surgical intervention, as depicted in Figure 2 below.



**Figure 2.**  NEC and NEC surgery in study infants. There were significant differences in NEC among the 3 groups (*P* = .05), **P* = .04 vs BOV, ***P* = .09 vs BOV, ****P* = .02 vs BOV. There were significant differences in NEC requiring surgical intervention among the 3 groups (*P* = .02), †*P* = .03 vs BOV, ††*P* = .007 vs BOV. [ ] refers to number of infants.

*Figure 2* [23]

---

[22] S. Sullivan, *et al.*, *An Exclusively Human Milk-Based Diet is Associated with a Lower Rate of Necrotizing Enterocolitis than a Diet of Human Milk and Bovine Milk-Based Products*, 156 J. Pediatrics 562-67 (2010).

[23] *Id.*

36.     In another 2020 publication, the twelve-center randomized trial published in 2010,[24] that compared bovine milk derived fortifier to human milk derived fortifier, was reviewed and analyzed.[25] The new study noted that it was common practice to feed preterm infants a base diet comprising of only human milk, usually fortified with a bovine derived fortifier.[26] The study took the old data[27] and focused on the infants who had a diet comprised 100% of their mothers' own milk (*i.e.*, they had no donor milk or preterm formula). This allowed for an isolated comparison of the bovine derived fortifier and the human derived fortifier. The study found that the bovine derived fortifier was associated with a higher risk of NEC, NEC requiring surgery, reduced head circumference gain, and death.[28] Despite the high intake of the mother's own milk, the bovine-derived fortifier was still associated with a 4.2-fold increased risk of NEC and a 5.1-fold increased risk of NEC surgery or death (see Figure 3 below). Thus, those fed a human derived fortifier were significantly advantaged in terms of a reduced incidence of morbidity. The authors concluded that the available evidence points to an increase in adverse outcomes with bovine derived fortifier, including NEC (Modified Bell's Staging Criteria Stage 2 or greater), NEC surgery or death, and surgical NEC.[29]

---

[24] Sullivan, *supra* note 22

[25] Lucas, *et al.*, *Preterm Infants Fed Cow's Milk-Derived Fortifier had Adverse Outcomes Despite a Base Diet of Only Mother's Own Milk*, 15 Breastfeeding Medicine 297-303 (2020).

[26] *Id.*

[27] Sullivan, *supra* note 22.

[28] Lucas, *supra* note 25.

[29] *Id.*

| Parameter | HMDF (n = 82) | CMDF (n = 32) |
|---|---|---|
| NEC (Bell Stage 2 or greater) | 3/82 (3.7%) | 5/32 (15.6%) |
| NEC surgery or death[b] | 3/82 (3.7%) | 6/32 (18.8%) |
| Surgical NEC[b] | 1/82 (1.2%) | 3/32 (9.4%) |
| Death[b] | 3/82 (3.7%) | 4/32 (12.5%) |
| BPD | 24/82 (29.3%) | 11/32 (34.4%) |
| Ventilator days | Median 9.5 | Median 15.5 |
| | IQR = 0.75, 41.25 | IQR = 1, 50.25 |
| ROP (grade 3 or 4) | 6/82 (7.3%) | 2/32 (6.3%) |

[a]Chi-square/Fisher's exact test for categorical variables; for ventilator days, Wilcoxon's test.
[b]Note that for the index "NEC surgery or death" there are three versus six cases in the HMDF and CMDF groups; this is one less in each group than the sum of NEC surgery and death when shown individually. This is because in each diet group, one case had *both* NEC surgery and death (not counted twice in the index).
BPD, bronchopulmonary dysplasia; CMDF, cow's milk-derived fortifier; HMDF, human milk-derived fortifier; ROP, retinopathy of prematurity.

*Figure 3* [30]

37.     Ziegler, et al. stated: "A fortifier based on human milk protein has recently been shown to provide, if used in conjunction with banked donor milk, better protection against NEC than a fortifier based on bovine milk protein used in conjunction with formula."[31]

38.     In 2011, the U.S. Surgeon General published a report titled, "The Surgeon General's Call to Action to Support Breastfeeding." In it, the Surgeon General warned that "for vulnerable premature infants, **formula feeding is associated with higher rates** of necrotizing enterocolitis (NEC)." [32]  This same report stated that premature infants who are not breast-fed are **138% more likely** to develop NEC. [33]

39.     In 2012, the American Academy of Pediatrics issued a policy statement that all premature infants should be fed an exclusive human milk diet because of the risk of NEC associated with the consumption of Cow's Milk-Based Products. The Academy stated that "[t]he

[30] *Id.*

[31] Ziegler EE. *Meeting the nutritional needs of the low-birth-weight infant.* Ann Nutr Metab. 2011;58 Suppl 1:8–18.

[32] U.S. Dept. of Health & Human Services, *The Surgeon General's Call to Action to Support Breastfeeding*, Washington, D.C., Office of the Surgeon General; 2011, p.1.

[33] *Id.*, Table 1, p. 2.

potent benefits of human milk are such that all preterm infants should receive human milk... If the mother's own milk is unavailable ...pasteurized donor milk should be used."[34]

40.     Ghandehari, et al. found in a 2012 study that feeding extremely premature infants a 100% human-milk-based diet (using human-milk-based fortifiers) significantly reduced the need for infants to return to total parenteral nutrition after beginning enteral feedings—a desired outcome, for both infants' health and NICU costs.[35]

41.     Further, a study published in 2013 showed that all 104 premature infants participating in the study receiving an exclusive human-milk based diet exceeded targeted growth standards and length and weight and head circumference gain. The authors concluded that "this study provides data showing that **infants can achieve and mostly exceed targeted growth standards when receiving an exclusive human milk-based diet**."[36] Thus, inadequate growth was proven to be a poor excuse for feeding Cow's Milk-Based Formula, but the practice has largely continued due to extensive and aggressive marketing campaigns conducted by infant formula such as the Defendants.

42.     Another study published in 2013 reported the first randomized trial in extremely premature infants of exclusive human milk versus preterm cow's milk-based formula. The study found a **significantly higher rate** of surgical NEC in infants receiving the cow's milk-based preterm formula and supported the use of exclusive human milk diet to nourish extremely preterm

---

[34] Margreete Johnston et al., *Breastfeeding and the Use of Human Milk*, 129 Pediatrics 827–41 (2012).

[35] Ghandehari H, Lee ML, Rechtman DJ; H2MF Study Group. *An exclusive human milk-based diet in extremely premature infants reduces the probability of remaining on total parenteral nutrition: a reanalysis of the data.* BMC Res Notes. 2012 Apr 25;5:188.

[36] Amy B. Hair et al., *Human Milk Feeding Supports Adequate Growth in Infants ≤ 1250 Grams Birth Weight*, 6 BMC Research Notes 459 (2013).

infants in the NICU. [37]

43.     In another study published in 2014, it was reported that NEC is "a devastating disease of premature infants and is associated with **significant morbidity and mortality**. While the pathogenesis of NEC remains incompletely understood, it is well established that the risk is increased by the administration of infant formula and decreased by the administration of breast milk."[38]  The same study found that NEC "is the **most frequent and lethal gastrointestinal disorder** affecting preterm infants and is characterized by intestinal barrier disruption leading to intestinal necrosis, multi-system organ failure and death.  The study noted that "NEC affects 7-12% of preterm infants weighing less than 1500 grams, and the frequency of disease appears to be either stable or rising in several studies and that the typical patient who develops NEC is a premature infant who displays a rapid progression from mild feeding intolerance to systemic sepsis, and **up to 30% of infants will die from this disease**."[39]  Advances in formula development have made it possible to prevent necrotizing enterocolitis, and the "exclusive use of human breast milk is recommended for all preterm infants and is associated with a significant decrease in the incidence of NEC." [40]

44.     In yet another study published in 2014 it was reported that an exclusive human milk diet, devoid of Cow's Milk-Based Products, was associated with "lower mortality and morbidity" in extremely preterm infants without compromising growth and should be considered as an

---

[37] E.A. Cristofalo et al., *Randomized trial of Exclusive Human Milk versus Preterm formula*, 163 J. Pediatrics 1592–95 (2013).

[38] Misty Good et al., *Evidence-Based Feeding Strategies Before and After Development of Necrotizing Enterocolitis*, 10 Expert Rev. Clin. Immunol. 875–84 (2014).

[39] *Id*.

[40] *Id*.

approach to nutritional care of these infants.[41]

45.     In 2016, a large study supported previous findings that an exclusive human milk diet in extreme preterm infants dramatically decreased the incidence of both medical and surgical NEC. This was the first study to compare rates of NEC after a feeding protocol implementation at multiple institutions and years of follow-up using an exclusive human milk diet. The authors concluded that the use of an **exclusive human milk diet is associated with "significant benefits"** for extremely preterm infants and while evaluating the benefits of using an exclusive human milk-based protocol, "it appears that there were **no feeding-related adverse outcomes**."[42]

46.     A publication by the American Society for Nutrition, in 2017, noted that human milk has "been acknowledged as the best source of nutrition for preterm infants and those at risk for NEC."  The study compared the results from two randomized clinical trials on preterm infants with severely low weight (between 500 and 1250 grams at birth) and compared the effect of cow's milk-based preterm infant formula to human milk as to the rate of NEC. Both trials found that an **exclusive human milk diet resulted in a much lower incidence of NEC**. While the study noted that cow's milk-based preterm formulas provided consistent calories and were less expensive than human milk-based products, the **cow's milk-based products significantly increase the risk of NEC and death**.[43]  The study also noted the **"exponential" health care costs** associated with NEC and noted data from the U.S. from 2011-2012 that showed that the cost of NEC is $180,000

---

[41] Steven Abrams et al., *Greater Mortality and Morbidity in Extremely Preterm Infants Fed a Diet Containing Cow Milk Protein Products*, 9 Breastfeeding Medicine 281–85 (2014).

[42] Amy B. Hair et al., *Beyond Necrotizing Enterocolitis Prevention: Improving Outcomes with an Exclusive Human Milk-Based Diet*, 11 Breastfeeding Medicine 70–74 (2016).

[43] Jocelyn Shulhan et al., *Current Knowledge of Necrotizing Enterocolitis in Preterm and the Impact of Different Types of Enteral Nutrition Products*, 8 Adv. Nutr. 80–91 (2017).

to $198,000 per infant and nearly doubles to $313,000 per infant for surgically treated NEC.[44] Further, NEC survivors accrue substantially higher outpatient costs.

47.     Another study published in 2017 reported: "Human milk is the preferred diet for preterm infants as it protects against a multitude of NICU challenges, specifically necrotizing enterocolitis … Preterm infants are susceptible to NEC due to the immaturity of their gastrointestinal and immune systems. An exclusive human milk diet compensates for these immature systems in many ways such as lowering gastric pH, enhancing intestinal motility, decreasing epithelial permeability, and altering the composition of bacterial flora. Ideally, preterm infants should be fed human milk and avoid bovine protein. A diet consisting of human milk-based human milk fortifier is one way to provide the additional nutritional supplements necessary for adequate growth while receiving the protective benefits of a human milk diet."[45]

48.     A Cochrane Library meta-analysis, last updated in 2018, analyzed data from eight trials including 1,605 participants who were either preterm or low birth weight infants in a neonatal unit.[46] The combined data showed a higher risk of NEC in the formula-fed group. The studies compared the use of formula and donor breast milk. The meta-analysis showed that the overall risk of the infant developing NEC with donor breast milk was 3.7% and the overall risk with formula was 7% (4.5-10.7%). The analysis documented that there is a higher risk of NEC in the formula-fed group. Below is a summary of the studies that were examined as part of the meta-analysis:

---

[44] *Id.*

[45] Diana Maffei et al., *Human Milk is the Feeding Strategy to Prevent Necrotizing Enterocolitis!* 41 Semin Perinatal. 36–40 (2017).

[46] Quigley, *et al.*, *Formula versus Donor Breast Mild for Feeding Preterm or Low Birth Weight Infants*, 6 Cochrane Database of Systematic Reviews (2018), *https://pubmed.ncbi.nlm.nih.gov/29926476/.*

a. **Term Formula versus Unfortified Donor Breast Milk:** the study evaluated the outcomes of preterm infants fed human milk compared to modified infant formula.[47] This study reported on 67 preterm infants from 1980 to 1982, comparing infants fed with unfortified donor milk and term formula. The results showed that three out of 26 infants on the formula milk developed NEC, whereas only one out of 41 infants receiving donor breast milk developed NEC—*a 300% difference*.

b. **Preterm Formula versus Fortified Donor Breast Milk:** the study evaluated growth, metabolic response, and development in very-low-birth-weight infants fed donor milk or enriched formula.[48] This study reported on 76 healthy infants of very low birth weights, comparing banked human milk and Similac Special Care protein-mineral–calorie-enriched formula. Two of the infants on the formula developed NEC while none of the infants on the donor milk developed NEC.

c. **Preterm Formula versus Fortified Donor Breast Milk**: this study evaluated the clinical impact of infants fed bovine fortified breast milk.[49] Published in 1996, this trial involved 276 preterm infants who were fed a base diet of a mother's own milk, and if insufficient breast milk was available, bovine based preterm formula was added. The number of infants with NEC was 5.8% in the fortified group compared to 2.2% in the control group. The trial showed that the addition of bovine derived fortifiers

---

[47] Gross SJ, *Growth and Biochemical Response of Preterm Infants Fed Human Milk or Modified Infant Formula*, 308 New England Journal of Medicine 237-41 (1983); Duke University Department of Pediatrics; Funded by Mead Johnson Nutrition.

[48] Tyson JE, *et al.*, *Growth, Metabolic Response, and Development in Very-Low-Birth-Weight Infants Fed Banked Human Milk or Enriched Formula. I. Neonatal Findings*, 103 Journal of Pediatrics 95-104 (1983).

[49] Lucas A., *et al.*, *Randomized Outcome Trial of Human Milk Fortification and Developmental Outcome in Preterm Infants*, 64 Am J Clin Nutr 142-51 (1996); Supported by Mead Johnson (Evansville, IN) which also supplied the fortifier.

to breast milk, as the sole intervention, more than doubled the combined incidence of confirmed NEC or sepsis.

    d.  **Preterm Formula versus Fortified Donor Breast Milk**: a randomized trial of extremely premature infants on donor human milk versus preterm formula was conducted.[50] This study, published in 2005, compared the differences in 243 infants fed with their mothers' milk, pasteurized donor milk plus Similac and/or Similac Neosure Human Milk Fortifier or Similac Human Milk Fortifier, and preterm formula (Similac and/or Similac Neosure Premature Formula). The results of this trial showed that infants who received their own mothers' milk had a 50% less chance of NEC and/or late-onset sepsis compared with infants fed either donor human milk or preterm formula.

    e.  **Preterm Formula versus Fortified Donor Breast Milk**: a randomized trial examining the use of exclusive human milk versus preterm formula diets in extremely premature infants was conducted.[51] This study, published in 2013, examined 53 extremely premature infants fed exclusive diets of either bovine milk–based preterm formula, or donor human milk with human milk-based fortifier. The incidence of NEC in the bovine formula group was 21% (five cases) versus 3% in the human milk group (one case). Surgical NEC was significantly higher in the bovine formula group (four cases) than human milk group (no cases). It was concluded that in extremely preterm infants, given exclusive diets of preterm formula versus human milk, there was a significantly higher rate of surgical NEC in infants receiving preterm formula. The researchers

---

[50] Schanler RJ, *et al.*, *Randomized Trial of Donor Human Milk versus Preterm Formula as Substitutes For Mothers' Own Milk in the Feeding of Extremely Premature Infants*, 116 Pediatrics 400-6 (2005).

[51] Cristofalo EA, *et al.*, *Randomized Trial of Exclusive Human Milk versus Preterm Formula Diets in Extremely Premature Infants*, 163 Journal of Pediatrics 1592-95 (2013).

concluded that this trial supported the use of an exclusive human milk diet to nourish extremely preterm infants in the NICU.

      f. **Preterm Formula versus Fortified Donor Breast Milk**: this study examined the effect of supplemental donor human milk compared with preterm formula on neurodevelopment of very low birth-weight infants at eighteen months.[52]  This trial evaluated 363 very low birth weight infants whose mother's breast milk became insufficient in four neonatal units in Ontario, California.  The infant mother's milk was supplemented with either preterm formula (Similac Special Care or Similac and/or Similac Neosure Premature), or pasteurized donor breast milk supplemented with a fortifier (Similac Human Milk Fortifier or Similac and/or Similac Neosure Human Milk Fortifier), and a protein module (Beneprotein-Nestlé).  The study showed that the nutrient enriched donor milk was associated with a lower risk of NEC (1.7%) compared with feeding preterm formula (6.6%).

49.    A 2020 review explained: "Due to the lack of effective treatments for NEC, research focus has shifted to testing strategies for the prevention of NEC, specifically early exposure to colostrum and mother's own milk …. Colostrum, the first milk produced by mothers in the days after birth, has been shown to contain high concentrations of beneficial immune mediators that provide bacterial and anti-inflammatory protection, and stimulate the development of the GI tract… Human breast milk contains many factors thought to help prevent NEC including nitrate/nitrite antioxidant factors, L-arginine, human milk oligosaccharides and prebiotics,

---

[52] O'Connor DL, *et al.*, *Effect of Supplemental Donor Human Milk Compared with Preterm Formula on Neurodevelopment of Very Low Birth-weight Infants at 18 months: A Randomized Clinical Trial*, 316 JAMA 1897-1905 (2016).  This study was funded by the Canadian Institutes of Health Research and the Ontario Ministry of Health and Long-Term Care.

secretary IgA, platelet-activating factor acetylhydrolase, lactoferrin, and growth factors."[53]

50.     Another 2020 review stated: "Human milk is the only modifiable risk factor that has been consistently shown to protect against the development of NEC."[54]   The specific mechanisms by which breast milk is protective continue to be studied. However, several non-nutrient components have been found to contribute to the immune functions of the gastrointestinal tract and augment mucosal integrity. These include secretory IgA, growth hormones (epidermal growth factor, insulin, and insulin-like growth factor), polyunsaturated fatty acids, and oligosaccharides. A 2019 study found that not only is an infant's IgA largely derived from maternal milk in the first month of life, but also that infants with NEC have larger proportions of IgA-unbound bacteria compared to age-matched controls."[55]   Scientific studies also establish that necrotizing enterocolitis carries significant risks for long-term complications among surviving infants. NEC requiring surgical treatment is causally associated with increased rates of neurodevelopmental delays, failure to thrive, intestinal failure, short-bowel syndrome, feeding difficulties, intestinal strictures, and intestinal adhesions with small-bowel obstruction.[56]

## C.  Defendants' False and Misleading Marketing of Cow's Milk-Based Infant Products

51.     Despite being aware of the significantly increased risk of NEC, devastating injuries, and/or death associated with use of their cow's milk-based products – especially in preterm and low birth weight infants – Defendants engaged in a deceptive marketing campaign in

---

[53] Alissa L. Meister et al., *Necrotizing Enterocolitis: It's Not All in the Gut*, 245 Experimental Biology and Medicine 85–95 (2020).

[54] Jocelyn Ou et al., *Nutrition in Necrotizing Enterocolitis and Following Intestinal Resection*, 12 Nutrients 520 (2020).

[55] *Id.*

[56] Catalina Bazacliu et al., *Necrotizing Enterocolitis: Long Term Complications*, 15 Current Pediatric Reviews 115–24 (2019).

which they misled parents of preterm and low birth weight infants into believing their products were safe and necessary for the growth of those infants.

52.    Notwithstanding strong medical evidence establishing the extreme dangers that cow-based products pose for premature infants, Mead has marketed its cow-based products as an equally safe alternative to breast milk, and indeed has promoted its products as necessary for additional nutrition and growth.  Defendants have specifically marketed their formula and fortifier as necessary to the growth and development of *premature infants* when their products pose a known and substantial risk to these babies.

53.    At all relevant times, Defendants maintained a website which promoted a range of products specifically for "premature and low weight" babies and made claims regarding Enfamil's ability to increase the babies' weight and caloric intake.

54.    Defendants' website falsely boasts their commitment to science and claims that their products are "backed by decades of research on breast milk research and clinical studies."[57]

55.    Defendants' Enfamil website also specifically targeted parents of premature and low birth weight infants by emphasizing the need for "catch-up growth," which could be achieved by feeding the infant the Enfamil product "Enfacare" as it was "[c]linically shown to promote catch-up growth similar to full-term breastfed infants."[58]

56.    Defendants' website devoted to Enfamil Premature Formula boasts that it "is specifically designed to promote [premature infants'] continued catch-up growth and development…by providing higher concentrations of the essential nutrients found in our regular

---

[57] Mead Johnson, *4 Important Baby Formula Ingredients*, https://www.enfamil.com/articles/4-important-baby-formula-ingredients/ (last visited June 9, 2023)

[58] Mead Johnson, https://www.enfamil.com/products/preemie-formula/ (last visited June 9, 2023)

infant formula…."[59]  The website further claims that "because your little one's belly is still developing, our preemie baby formula is easy on the tummy."[60]

57.     The webpage states that Enfamil Premature Formula has "brain-building nutrition" and "immune support."[61]

58.     On a page of the Enfamil website titled, "Why Enfamil?" it states: "When it comes to making important choices about your baby's nutrition, there's nothing like a recommendation from a trusted source. Whether it comes from your pediatrician, the hospital where your baby was born, or another mom, using Enfamil gives you the confidence you've made the best choice for your baby."[62]

59.     Defendants' Enfamil website gives mothers the illusion of choice by stating that they should take recommendations from pediatricians, hospitals, and other moms. However, further down the page, the website contains the following:

a.   The statement that Enfamil is the "#1 formula brand recommended by pediatricians."

b.   The statistic that "80% of birthing hospitals use Enfamil."

c.    A purported review from "Enfamil Mom" stating "Just wanted to say great job Enfamil! Excellent formula by far … I work with four other expectant mothers and have referred them all to Enfamil."[63]

60.     The Enfamil website creates the illusion that all trusted sources recommend Enfamil and does not reference the extreme dangers their products pose to premature infants.

---

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] https://www.enfamil.com/why-enfamil/ (last visited June 9, 2023)

[63] *Id.*

61.     None of Defendants' marketing materials – including their promotional websites – referenced the scientific data showing how significantly their products increased the risk of NEC, devastating injuries, and death.

62.     Defendants' website devoted to their cow's milk-based products was false and misleading as it created the false idea that those products are created based on the latest science and thus are safe for preterm and low birth weight infants, when in fact, science had proven their cow's milk-based products significantly increased the risk of NEC, devastating injuries, and death in preterm and low birth weight infants.

63.     Defendants' website was false and misleading as it created a false equivalency between formula and breast milk and intentionally omitted the established fact that cow's milk-based products have been proven to significantly increase the risk of NEC, devastating injuries, and/or death in premature and low birth weight infants.

64.     The statements on Defendants' website that indicated that their cow's milk-based products were necessary for "catch-up-growth" in preterm and low birth weight infants were false and misleading as they failed to inform of the risk those products posed of the infant developing NEC.

65.     Defendants' marketing campaign was designed to make parents believe that their products were safe and necessary for the growth of premature and low birth weight infants despite decades of research that established the fact that cow's milk-based products significantly increased the risk of a premature infant developing NEC, devastating injuries, and death.

66.     T.A.H.'s parents were exposed to Defendants' false and misleading marketing which caused and/or substantially contributed to T.A.H. being fed Defendants' cow's milk-based products.

67.     T.A.H.'s parents, members of the medical community, physicians, and hospitals, relied upon the representations and advertising of Defendant, Mead Johnson, which categorically omitted the fact that its cow's milk-based products significantly increase the risk of NEC, devastating injuries, and death in premature infants, which caused and/or substantially contributed to the products being fed to T.A.H.

68.     The WHO and United Nation's International Children's Emergency Fund (UNICEF) held a meeting more than two decades ago to address concerns over the marketing of breast-milk substitutes. The WHO Director concluded the meeting with the following statement, "**In my opinion, the campaign against bottle-feed advertising is unbelievably more important than the fight against smoking advertisement**."[64]

69.     Recognizing the abuse and dangers of the marketing of infant formula, in 1981, the World Health Assembly ("WHA"), the decision-making body of the world's Member States, developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk and outlawed any advertising or promotion of breast milk substitutes to the general public.  Pursuant to Article 5.1 of the Code, advertising of breast-milk substitutes is specifically prohibited: "**There should be no advertising or other form of promotion to the general public** [of breast milk substitutes]."[65] (emphasis added). In Article 5.2, the Code states that "manufacturers and distributors should not provide, **directly or indirectly**, to pregnant women, mothers or members of their families, samples of products within the scope of this Code."  In addition, the Code expressly prohibits, "point-of-sale

---

[64] Jules Law, *The Politics of Breastfeeding: Assessing Risk, Dividing Labor*, JSTOR SIGNS, vol. 25, no. 2: 407-50 (2000) (emphasis added).

[65] The International Code of Marketing of Breast-milk Substitutes. Geneva: World Health Organization, p.16 - 20 (1981).

advertising, giving of samples, or any other promotion device to induce sales directly to the consumer at the retail level, such as special displays, discount coupons, premiums, special sales…"

70.     The World Health Organization's 2018 Status Report on this issue noted that "despite ample evidence of the benefits of exclusive and continued breastfeeding for children, women, and society, far too few children are breastfed as recommended." The Status Report states that "**a major factor undermining efforts to improve breastfeeding rates is continued and aggressive marketing of breast-milk substitutes**," noting that in 2014, the global sales of breast-milk substitutes amounted to **US $44.8 billion** and "is expected to rise to **US $70.6 billion** by 2019." *Marketing of Breast-milk Substitutes: Nat'l Implementation of the Int'l Code, Status Report 2018*. Geneva: World Health Org., 2018, p.21 (emphasis added).

71.     Recognizing a shift in the medical community towards an exclusive human-based diet for preterm infants, Defendants began heavily promoting "human milk fortifiers," a name which misleadingly suggests that the product is derived from human milk, instead of being derived from cow's milk.

72.     Defendants have designed competing, systematic, powerful, and misleading marketing campaigns to persuade physicians and parents to believe that: (1) Cow's Milk-Based Formula and Fortifiers are safe; (2) Cow's Milk-Based Products are equal, or even superior, substitutes to breastmilk; and (3) physicians consider their Cow's Milk-Based Products a first choice. Similarly, Defendants market their products for preterm infants as necessary for growth, and perfectly safe for preterm infants, despite knowing of the extreme risks posed by Cow's Milk-Based Products and failing to warn of the deadly disease of NEC.

73.     Thus, despite the existence of alternative and safe human milk-based fortifiers, Defendants continue to market and/or sell the Cow's Milk-Based Products under the guise of being

a safe product for newborns and despite knowing the significant health risk posed by ingesting these products, especially to preterm, low weight infants like T.A.H.

**D.  The Inadequate Warnings**

74.    Defendants promote the use of their preterm infant Cow's Milk-Based Products to parents, physicians, hospitals, and medical providers as safe products that are specifically needed by preterm infants for adequate growth.

75.    Despite the knowledge of the significant health risks posed to preterm infants ingesting the Cow's Milk-Based Products, including the significant risk of NEC, Defendants did not warn parents or medical providers of the risk of NEC in preterm infants, nor did Defendants provide any instructions or guidance on how to properly use their Cow's Milk-Based Products so as to lower the risk or avoid NEC.

76.    In fact, Defendants did not provide any warning in their labeling, websites, or marketing that warns that their Cow's Milk-Based Products exponentially increase the risk of NEC in preterm infants, or that human breast milk, donor breast milk, and human breast milk-based formulas and fortifiers are much safer for preterm babies than their Cow's Milk-Based Products.

**E.  Safer Alternative Designs**

77.    Infant formulas and fortifiers made or derived from cow's-milk ingredients, including the products fed to T.A.H., are unsafe for premature infants and are avoidable because safe alternatives—including human donor milk and human-milk-derived formula and fortifier— are available and were available before T.A.H.'s birth.

78.    The products are not unavoidably unsafe. For decades before T.A.H. was fed the products, Defendants and the formula industry knew that infant formulas and fortifiers designed and formulated without cow's-milk were not only scientifically possible but practically feasible.

These alternative designs include products derived exclusively from human milk or amino acids without diminishing the product's utility, safety, or effectiveness Defendants were attempting to achieve with cow's-milk-based products.

79.     Since 2006, Prolacta Bioscience has manufactured and sold fortifiers and formulas for premature infants that contain no cow's-milk. These products are an example of a feasible alternative design. These alternative designs provide all the necessary nutrition and growth that bovine formula provides, without the deadly effects of NEC.

80.     On information and belief, Defendants were aware of the increased risk of NEC and death associated with their cow's-milk-based products and instead of warning of (or removing) the dangers, Defendants have stubbornly insisted on continuing to use cow's milk as the foundation of the Products, which are marketed to and labeled for feeding to premature infants.

## COUNT I:  STRICT LIABILITY
## DESIGN DEFECT

81.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

82.     At all relevant times, Defendants and others with whom they acted in concert were engaged in the business of designing, formulating, manufacturing, distributing and selling of Cow's Milk-Based Formula and Fortifier products, which are defectively designed and/or unreasonably dangerous to consumers, including T.A.H., intending or expecting that these products would be sold and used in the State of New York.

83.     At all relevant times, Defendants' bovine-based formula and fortifier products were expected to reach and did reach the intended consumers, handlers, and users of these products in the State of New York and throughout the United States, including Plaintiff and T.A.H., without

substantial change in their condition as designed, formulated, manufactured, distributed, sold, labeled, and marketed by Defendants.

84.     Defendants, as the manufacturers and/or sellers of the infant formula and fortifier products at issue, have a duty to hold the knowledge and skill of an expert and is obliged to keep abreast of any scientific discoveries and are presumed to know the result of all such advances.

85.      Defendants, as the manufacturers and/or sellers of the infant formula and/or fortifier at issue, owed a duty to the consuming public, including Plaintiff, to manufacture, sell, and distribute the formula and/or fortifier in a manner that was not unreasonably dangerous for their intended use.

86.     Defendants' bovine formulas and/or fortifiers were designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by Defendants in a defective or unreasonably dangerous condition at the time the products were placed in the stream of commerce for nutritional use for preterm infants.

87.     Defendants specifically marketed and created their Cow's Milk-Based Products for use as nutrition and nutritional supplements for preterm infants, like T.A.H.

88.     Defendants' Cow's Milk-Based Products are expected to and do reach the user without substantial change affecting that defective and/or unreasonably dangerous condition.

89.     Prior to T.A.H.'s birth, Defendants were aware or should have been aware that their Cow's Milk-Based Products were not safe for use, as they were used, with nutrition or nutritional support in preterm infants, yet took no steps to prevent the use of these products in such situations.

90.     Defendants knew or should have known that the use of their Cow's Milk-Based Products with preterm infants was unreasonably dangerous in that their Cow's Milk-Based Products significantly increased the risk of NEC.

91.     Furthermore, scientific data and well-researched studies have concluded that the Cow's Milk-Based Products of the Defendants carried unreasonable risks of NEC, which far outweighed the products' benefits for preterm infants like T.A.H.

92.     Despite the foregoing, the Defendants continued and currently continue to sell and market their defective and/or unreasonably dangerous products to preterm infants.

93.     The products were defectively manufactured and/or designed and/or unreasonably dangerous, including, but not limited to the following particulars:

a.      The products did not perform as safely as an ordinary consumer would expect when used in the intended or reasonably foreseeable manner, such that the use of Cow's Milk-Based Products as nutrition or nutritional supplements in preterm infants significantly increased the risk of NEC;

b.      The products contained hidden and dangerous design defects and were not reasonably safe as intended to be used, subjecting preterm infants, such as T.A.H., to risks of serious bodily injury;

c.      The products failed to meet legitimate, commonly held, minimum safety expectations of that product when used in an intended or reasonably foreseeable manner;

d.      Defendants failed to utilize economical and technically available safer design alternatives for preterm infant formula and fortifiers, with such alternative design(s) capable of preventing Plaintiffs' damages, which were available for use here, and the danger of the damage from Defendants' bovine formulas and/or fortifiers outweighed the burden on Defendants of adopting the alternative design(s);

e.      The products were manifestly unreasonable in that the risk of harm so clearly exceeded the products' utility that a reasonable consumer, informed of those risks and utility, would not purchase the product;

f.      Defendants failed to adopt an adequate or sufficient quality control program;

g.      Defendants failed to inspect or test their products with sufficient care; and/or

h.      Defendants' formulas and/or fortifiers were not accompanied by adequate instructions and/or adequate warnings to fully apprise consumers, including Plaintiffs, of the full nature and extent of the risks and side effects associated with their use.

94.     As a direct and proximate cause of the Cow's Milk-Based Products' unreasonable dangerous condition, T.A.H. developed NEC and suffered serious bodily injury.

95.     Defendants are thus strictly liable to Plaintiff under state law for manufacturing, aggressively marketing, and selling cow's-milk-based formulas and fortifiers for feeding to premature infants because the formulas were defective in design.

96.     Given the reprehensibility of Defendants' conduct, which was undertaken willfully, with actual malice, and/or such gross negligence as to indicate a wanton disregard for the rights of others, including the safety of the vulnerable infant population who would foreseeably be harmed by Defendants' acts and omissions, the Court should assess Defendants with punitive damages under state law.

97.     Defendants have failed to take corrective action to re-design the products after learning about how their cow's-milk-based formula and fortifier products, including the products, have caused infants to NEC, surgical treatment, and death. Instead, Defendants have actively concealed information about how these products cause NEC from the public and profited substantially from these actions.

98.     Punitive damages are necessary to punish Defendants and deter Defendants and other infant-formula corporations from continuing to manufacture, market, and sell cow's-milk-based formulas and fortifiers for feeding to premature infants.

99.     Defendants' actions were willful and malicious in that Defendants' conduct was carried on with a conscious disregard for the safety and rights of Plaintiff and others. Defendants' unconscionable conduct thereby warrants an assessment of exemplary and punitive damages against Defendants in an amount appropriate to punish Defendants and deter similar conduct in the future.

## COUNT II:  NEGLIGENT DESIGN DEFECT

100. Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

101. Defendants, as the manufacturers and/or sellers of Cow's Milk-Based Products, owed a duty to the consuming public in general, and Plaintiff in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute products free of unreasonable risk of harm to users and patients, when said product is used in their intended manner.

102. Defendants, as manufacturers, have a duty to hold the knowledge and skill of an expert, and is obliged to keep abreast of any scientific discoveries and are presumed to know the result of all such advances.

103. Defendants, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed and/or sold the subject Cow's Milk-Based Products.

104. Defendants breached the duty owed to Plaintiff and acted negligently in their actions, including, but not limited to, the following:

    a. designed the products such that there are latent and not obvious dangers for consumers and patients while the products are being used in a foreseeable and intended manner;

    b. designed the products such that they contained hidden and dangerous design defects and were not reasonably safe as intended to be used, subjecting preterm infants to risks of serious bodily injury in that the products' design and/or manufacture amounted to and/or resulted in a defect failure mode of the products;

    c. failing to collect data to determine if their products were safe for preterm infants;

    d. failing to collect data to determine when and how their products could be used safely;

    e. failing to utilize the significant peer reviewed research to develop instructions;

32

f.    failing to develop evidence-based guidelines or instructions to decrease the risk of their products causing NEC;

g.    failing to provide evidence-based guidelines or instructions to decrease the risk of their products causing NEC;

h.    failing to stop or deter their products from being fed to extremely preterm infants like T.A.H.;

i.    failing to provide evidence-based instructions or guidance on when or how a preterm infant should be transitioned to the products;

j.    failing to continuously and vigorously study their cow's milk-based products in order to avoid NEC in premature infants;

k.    failing to utilize economical and technically available safer manufacturing and/or design alternatives for the preterm infant formula and fortifier;

l.    failing to adopt an adequate or sufficient quality control program;

m.    failing to inspect or test their products with sufficient care; and/or

n.    failing to properly and adequately warn of the risks of NEC with use of their products.

105.    Defendants knew or should have known that their products were to be used as nutrition and nutritional supplements with preterm infants, like T.A.H.

106.    Defendants knew or should have known that the use of their Cow's Milk-Based Products with preterm infants was unreasonably dangerous in that their Cow's Milk-Based Products significantly increased the risk of NEC.

107.    Furthermore, scientific data and well researched studies have concluded that the Cow's Milk-Based Products of the Defendants carried unreasonable risks of NEC, which far outweighed the products' benefits for premature infants like T.A.H.

108.    As a direct and proximate result of the negligence of Defendants, T.A.H. developed NEC and suffered serious bodily injury.

109.    Defendants were negligent in the defective design of the products because

Defendants knew or should have known, in the exercise of ordinary care, that the products were unreasonably dangerous because they were made from cow's-milk ingredients, and Defendants failed to warn of the products' unreasonably dangerous conditions.

110.    Other manufacturers in Defendants' industry designed infant formulas and fortifiers that did not include the dangerous cow's-milk ingredients.

111.    Defendants' design for their premature-infant formulas and fortifiers was defective because it included ingredients known to cause NEC in premature infants.

112.    Cow's-milk ingredients are not necessary components of infant formulas or fortifiers, so they are not an unavoidably unsafe aspect of the product.

113.    The defective nature of the product existed at the time it left the control of Defendants.

114.    Defendants are thus liable to Plaintiff under state law for negligently manufacturing, aggressively marketing, and selling cow's-milk-based formulas and fortifiers for feeding to premature infants because the products were defective in design.

115.    Given the reprehensibility of Defendants' conduct, which was undertaken willfully, with actual malice, and/or such gross negligence as to indicate a wanton disregard for the rights of others, including the safety of the vulnerable infant population who would foreseeably be harmed by Defendants' acts and omissions, the Court should assess Defendants with punitive damages under state law.

116.    Defendants have failed to take corrective action to re-design the products after learning about how their cow's-milk-based formula and fortifier products have caused infants to develop NEC, require surgical treatment, and die. Instead, Defendants have actively concealed

information about how their products cause NEC from the public and profited substantially from these actions.

117.     Punitive damages are necessary to punish Defendants and deter Defendants and other infant-formula corporations from continuing to manufacture, market, and sell cow's-milk-based formulas and fortifiers for feeding to premature infants.

## COUNT III:  STRICT LIABILITY
## FAILURE TO WARN

118.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

119.     Defendants are strictly liable to Plaintiff under state law for failing to warn of its products' unreasonably dangerous conditions or instruct on their proper use.

120.     Defendants, as the manufacturers and/or sellers of the infant formulas and fortifiers at issue, owed a duty to the consuming public and Plaintiff, to properly warn and provide adequate warnings, instructions, labeling, and/or packaging about the dangers and risks associated with the use of their products by preterm infants, including, but not limited to, the risk of NEC.

121.     Defendants' products were unreasonably dangerous because they included cow's milk-ingredients. This condition existed at the time the products left Defendants' control, and the products' unreasonably dangerous condition proximately caused injury to T.A.H. and his parents.

122.     Defendants failed to properly warn and provide adequate warnings, instructions, labeling, and/or packaging about the dangers and risks associated with the use of their products by preterm infants, including, but not limited to, the risk of NEC.

123.     Given the bovine formulas and fortifiers at issue are non-prescription, do not require a physician's recommendation, and are sold with packaging and labels meant to inform the average consumer, the learned intermediary doctrine does not apply.

124. The FDA has issued guidance specifically for the labeling of infant formulas, stating in part:

> Infant formulas are intended for a vulnerable population and may serve as a sole or primary source of nutrition for some infants during a critical period of growth and development. Caregivers of babies fed infant formula products must be able to trust that the information on the label is truthful, not misleading, and scientifically supported. [61]

125. Defendants sold the products to hospitals and directly to consumers.

126. Defendants, as the manufacturer and seller of the subject products, had a non-delegable duty to design reasonably safe products; and thus, they cannot rely upon any intermediary, including physicians, other healthcare providers, or healthcare staff, to fully warn the end user of the hidden dangers and risks in their infant formula products that contain bovine-based ingredients, specifically as it relates to the serious injuries that may result in preterm infants due to the increased risk of NEC.

127. Defendants had a duty to manufacture and distribute infant formula products that were reasonably safe for their foreseeable uses. It was Defendants' duty to adequately warn of the unreasonable risk of harm posed by bovine-based ingredients in their formulas and fortifiers, specifically the increased risk of NEC, bodily injury, and even death, which may result with the use of their formulas by pre-term infants, like T.A.H.

128. At the time the products left Defendants' control, Defendants knew or should have known, as a leader in the industry, that the formulas and/or fortifiers manufactured and/or distributed by Defendants were unreasonably dangerous because they caused NEC in premature infants and that the ordinary consumers of these products (caregivers for premature infants) would not realize the products' dangerous condition.

---

[61] U.S. Food and Drug Administration, *FDA Issues Guidance for the Labeling of Infant Formula*, September 16, 2016, https://www.fda.gov/food/cfsan-constituent-updates/fda-issues-guidance-labeling- infant-formula.

129.    The significantly increased risk of NEC was not an open and obvious danger of the products, which were labeled for feeding to premature infants.

130.    Despite Defendants' knowledge of this dangerous condition and consumers' lack of awareness of the danger, Defendants failed to provide an adequate product warning or instruction that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger. A reasonably prudent person would consider NEC to be a serious risk and warn that the products could cause NEC in premature infants.

131.    Defendants further failed to provide an adequate warning or instruction that took into account the characteristics of, and ordinary knowledge common to, the persons by whom the products were intended to be used. It was not, and is not, common knowledge among ordinary parents or medical providers of premature infants that Defendants' cow's-milk-based formulas and fortifiers can cause NEC in premature infants.

132.    Defendants' products did not contain a warning label approved by the Food and Drug Administration under 21 U.S.C. § 301 *et seq.*, so Defendants are not entitled to a rebuttable presumption that the warning label was adequate.

133.    Defendants knew or should have known that their cow's-milk-based formula and fortifier products, including Enfamil Premature Infant Formula – 24 Cal, Enfamil Premature Infant Formula – 24 Cal High Protein, Enfamil Premature Infant Formula – 30 Cal, and Enfamil Human Milk Fortifier Powder, would be fed to extremely premature and extremely low-birth-weight infants like T.A.H., but Defendants failed to properly warn hospitals, NICUs, doctors, parents, and/or consumers that Defendants' cow's-milk-based products significantly increase the risk of NEC and death in those babies.

134.    Specifically, Defendants breached their duty to the consuming public, including

Plaintiff, to warn of the foreseeable risks of the formulas and/or fortifiers at issue by:

    a. failing to design warnings that would be reasonably expected to catch the attention of consumers;

    b. failing to give a fair indication of the specific risks of cow's milk-based formula and fortifier products, including that it significantly increased the risk of NEC and death in premature infants;

    c. failing to give warnings of an intensity justified by the magnitude of the risk of NEC and death as a result of cow's milk-based formula and/or fortifier consumption by premature infants;

    d. failing to properly and adequately warn consumers, including, but not limited to, physicians, hospitals, hospital staff, healthcare providers, and parents and/or guardians, that their bovine formulas and/or fortifier products significantly increase the risk of NEC and death in preterm infants;

    e. failing to provide consumers with adequate instructions on proper use and administration of the subject products when used on preterm infants;

    f. failing to warn consumers that the subject products were unsafe and/or not intended for the consumption by premature infants, including T.A.H.;

    g. failing to warn consumers that their product caused an increased risk of NEC, specifically as it relates to preterm infants being enterally fed the subject products;

    h. failing to provide consumers with proper instructions, labeling, and/or packaging on how to administer and/or feed the subject products to premature infants in order to decrease the risk of NEC and/or avoid other significant complications including death;

    i. failing to insert warnings and/or instructions in their packaging of other alternatives to bovine formulas including human milk-based formulas and fortifiers which pose a decreased risk of NEC;

    j. providing instructions, packaging, and labeling containing warnings that were dangerously inadequate, vague, inaccurate, incomplete, unclear, and did not warn that bovine based ingredients significantly increase the risk of NEC;

    k. failing to provide a label and/or instructions that reflect prominent studies regarding the risks and benefits of bovine formulas and/or fortifiers;

l.   failing to warn physicians and healthcare providers in the instructions, labeling, and/or packaging of the extreme risk associated with feeding premature infants bovine formula and/or fortifiers;

m.   failing to provide detailed instructions to physicians and/or hospitals, and other healthcare providers on when to stop feeding the subject product to preterm infants;

n.   failing to take adequate measures to warn parents and/or guardians of the dangers in using the subject products;

o.   failing to warn and/or concealing that there is a significant risk of NEC in premature infants fed bovine-based formula, despite knowing that numerous studies and scientific data have established that there is a significant risk of NEC in premature infants fed bovine-based formula;

p.   failing to place a large and prominent black-box-type warning and instructions to consumers that would have prevented the feeding of the subject products to preterm infants, including T.A.H.;

q.   failing to establish an appropriate standard for safe use;

r.   failing to provide statistical evidence of adverse effects regarding the feeding of their products to preterm infants;

s.   failing to guide, instruct, and/or advise on when preterm infants should be administered the formula, the amount of formula and/or fortifier that should be administered, when the amount of formula and/or fortifier should be increased, the frequency of the administration of the formula and/or fortifier, when feeding with their formula and/or fortifier is not safe and/or inappropriate, and when preterm infants should stop using this formula and/or fortifier;

t.   failing to develop a protocol for hospitals and physicians with the elements to assure safe use;

u.   failing to send "Dear Dr." letters warning of the risks of NEC, the need for surgery, and/or death based on the current scientific research and data to better guide hospitals and physicians caring for premature infants;

v.   failing to advise physicians, healthcare professionals, and parents that cow's

milk-based products are not necessary to achieve growth and nutritional targets for premature infants;

w. failing to advise physicians, healthcare providers, and parents that human milk is superior to cow's-milk-based products to support the nutrition and health of premature infants;

x. failing to instruct or warn that an exclusive human-milk-based diet significantly decreases the risk of NEC when compared to a diet that includes cow's-milk-based products;

y. failing to advise physicians, healthcare providers, and parents that human-milk-based products and amino-acid-based and/or hydrolyzed formulas were viable alternatives to cow's milk-based products to significantly reduce the risk of premature infants developing NEC;

z. failing to directly warn parents of the risk that their cow's-milk-based formulas and fortifiers would cause NEC, despite knowing that parents were not being warned of the risk of NEC by their children's physicians;

aa. failing to require or recommend that hospitals and/or physicians inform parents before feeding Defendants' products to their premature babies that cow's-milk-based products significantly increase the risk of NEC, the need for surgery, and/or death;

bb. failing to provide a thorough and detailed risk-benefit analysis on the decision to feed cow's-milk-based formulas and/or fortifiers to premature infants for hospitals, doctors, and parents;

cc. failing to provide periodic or yearly safety reports;

dd. failing to provide periodic or yearly risk-benefit analyses for use of their products; and/or

ee. providing warnings that were severely inadequate, vague, confusing, and provided a false sense of security because Defendants warn and instruct about other specific product uses and risks (including warnings not to microwave formula before feeding it to infants), but do not warn that cow's-milk-based formulas and fortifiers significantly increase the risk of NEC, the need for surgery, and/or death for premature infants and provide no information on how to avoid such harm.

135.    The absence of adequate warnings and instructions rendered Defendants' bovine formula product unreasonably dangerous for Plaintiff.

40

136.    Defendants' failure to warn was deliberate because Defendants knew that if they advised physicians and healthcare providers of the extreme risks associated with feeding premature infants cow's-milk-based products, they would not have purchased such dangerous products for feeding to premature infants in hospitals, including neonatal intensive care units.

137.    Defendants' massive marketing campaigns as detailed above have had the effect of: (1) diminishing the ability of parents to intelligently resist the decision of a healthcare provider to feed cow's-milk-based products; (2) diminishing mothers' desire to breastfeed by framing it as a personal decision without health ramifications for infants, especially premature infants; (3) diminishing mothers' confidence in the capability of their bodies to provide sufficient and adequate nutrition for their premature infants without help from Defendants' products; (4) interfering with and supplanting the physician-patient relationship with respect to nutritional decision-making for newborns; (5) making it more difficult for a physician or other medical provider to persuade a mother to breastfeed; and (6) making it easier and more economically viable for hospitals to feed preemies cow's-milk-based products rather than donor milk or human-milk-derived products.

138.    Had physicians, hospitals, and other healthcare providers known of the extreme risk associated with feeding premature infants Defendants' bovine formula and/or fortifier, they would not have administered Defendants' unsafe product to T.A.H.

139.    Had Plaintiff known of the extreme risks associated with feeding premature infants bovine formula and/or fortifier, she would not have allowed Defendants' unsafe product to be administered to T.A.H.

140.    As a direct and proximate result of Defendants' conduct, as described herein, T.A.H. was administered and/or enterally fed the subject product, causing him to develop NEC.

141.    As a direct and proximate result of Defendants' conduct, as described herein,

Plaintiff suffered significant damages, including severe emotional distress, loss of income, and other damages.

142. As a direct and proximate result of Defendants' conduct, as described herein, T.A.H. sustained significant injuries.

143. Given the reprehensibility of Defendants' conduct, which was undertaken with actual malice and/or wanton and willful disregard for the safety of the vulnerable infant population who would foreseeably be harmed by Defendants' acts and omissions, the Court should assess Defendants with punitive damages under state law.

144. Defendants have failed to take corrective action after learning about how their cow's-milk-based formula and fortifier products have caused infants to develop NEC, require surgical treatment, and die. Instead, Defendants have actively concealed information about how these products cause NEC from the public and profited substantially from these actions.

145. Punitive damages are necessary to punish Defendants and deter Defendants and other massive infant-formula corporations from continuing to manufacture, market, and sell cow's-milk-based products for feeding to premature infants.

## COUNT IV: NEGLIGENT FAILURE TO WARN

146. Plaintiff incorporates by reference the preceding Paragraphs as if fully set forth herein.

147. Defendants are liable to Plaintiff under state law for negligently failing to warn of the products' unreasonably dangerous conditions or instruct on their proper use.

148. Defendants, as the manufacturer, designer, seller, and distributor of the bovine formulas and/or fortifiers at issue, had a duty to the consuming public, including Plaintiff, to exercise reasonable care to design, test, manufacture, inspect, and distribute a safe product that

did not present an unreasonable risk of harm to consumers when used in their intended manner and for their intended purpose.

149.   At all relevant times, T.A.H. was administered the formula and/or fortifier at issue in their intended manner and for their intended purpose.

150.   Defendants negligently and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the bovine products at issue and thereby breached their duty to the consuming public, including Plaintiff.

151.   The products were unreasonably dangerous. The products' design, which included cow's-milk ingredients, caused them to have an unreasonably dangerous condition. This condition existed at the time the products left the Defendants' control, and the products' unreasonably dangerous condition proximately caused injury to T.A.H. and Plaintiff.

152.   Defendants failed to warn Plaintiff, T.A.H.'s medical providers, and the public that their products could cause NEC and significantly increased the risk that a preterm infant would suffer NEC.

153.   Defendants failed to instruct Plaintiff, T.A.H.'s medical providers, and the public about how to safely use their products with preterm infants.

154.   Defendants' cow's-milk-based formula and fortifier products are not prescription drugs, medical devices, or other products intended to be used only under the supervision of a physician or other medical professional.

155.   Defendants sold the products to hospitals and directly to consumers.

156.   At the time the products left Defendants' control, Defendants knew or, considering reasonably available knowledge should have known, that cow's-milk-based formulas and

fortifiers caused NEC in premature infants and that the ordinary consumers of these products (caregivers for premature newborns) would not realize the products' dangerous condition.

157. The significantly increased risk of NEC was not an open and obvious danger of the products, which were labeled for feeding to premature infants.

158. Despite Defendants' knowledge of this dangerous condition and consumers' lack of awareness of the danger, Defendants failed to provide an adequate product warning or instruction that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger. A reasonably prudent person would consider NEC to be a serious risk and warn that the products could cause NEC in premature infants.

159. Defendants further failed to provide an adequate warning or instruction that took into account the characteristics of, and ordinary knowledge common to, the persons by whom the products are intended to be used. It was not, and is not, common knowledge among ordinary parents or medical providers of premature newborns that Defendants' cow's-milk-based formulas and fortifiers can cause NEC in premature infants.

160. Defendants' products did not contain a warning label approved by the Food and Drug Administration under 21 U.S.C. § 301, *et seq.*, so Defendants are not entitled to a rebuttable presumption that the warning label was adequate.

161. Defendants knew or should have known that their cow's-milk-based formula and fortifier products, would be fed to extremely premature and extremely low-birth-weight infants like T.A.H., but Defendants failed to properly warn hospitals, NICUs, doctors, parents, and/or consumers that Defendants' cow's-milk-based products significantly increase the risk of NEC and death in those babies.

162. Specifically, Defendants breached their duty to the consuming public, including

Plaintiff, by:

    a.   failing to properly warn consumers, including but not limited to physicians, hospitals, hospital staff, healthcare providers, and parents and/or guardians, that their bovine products significantly increase the risk of NEC and death in preterm infants;

    b.   failing to provide consumers with adequate instructions on proper use and administration of the subject products when used on preterm infants;

    c.   failing to warn consumers that the subject products were unsafe and/or not intended for the consumption of premature infants including T.A.H.;

    d.   failing to warn consumers that their product caused an increased risk of NEC, specifically as it relates to preterm infants being enterally fed the subject products;

    e.   failing to provide consumers with proper instructions, labeling, and/or packaging on how to administer and/or feed the subject products to premature infants in order to decrease the risk of NEC and/or avoid other significant complications, including death;

    f.   failing to insert warnings and/or instructions in their packaging, notifying the consuming public of safe alternatives to bovine formulas and/or fortifiers, including human milk which decreases the risk of NEC;

    g.   providing instructions, packaging, and labeling containing warnings that were dangerously inadequate, vague, and did not warn that bovine-based ingredients significantly increase the risk of NEC;

    h.   failing to establish a label and/or instructions that notify the consuming public of reliable scientific studies and data establishing the risks of bovine formulas and/or formulas;

    i.   failing to warn physicians and healthcare providers in the instructions, labeling, and/or packaging of the significant risk associated with administering premature infants' bovine formulas and/or fortifiers;

    j.   failing to provide detailed instructions to physicians, hospitals, and healthcare providers regarding when to stop administering the subject product to preterm infants;

k.  failing to take adequate measures to warn parents and/or guardians of the dangers in using the subject products;

l.  failing to warn and/or concealed that there is a significant risk of NEC in premature infants fed bovine-based formula, despite knowing that numerous studies and scientific data have established that there is a significant risk of NEC in premature infants fed bovine based formula;

m.  failing to place a prominent warning and instructions that would have prevented the administering of the subject products to T.A.H.;

n.  failing to establish an appropriate standard for safe use;

o.  failing to provide statistical evidence of adverse effects regarding the administration of their products to preterm infants;

p.  failing to guide, instruct, and/or advise the consuming public regarding when preterm infants should be administered the subject product, the amount of formula and/or fortifier that should be administered, when the amount of formula and/or fortifier should be increased, the frequency of the administration of the formula and/or fortifier, when feeding with their formula and/or fortifier is not safe and/or inappropriate, and when preterm infants should stop using their formula and/or fortifier;

q.  failing to develop a protocol for hospitals, physicians, and healthcare providers to ensure safe use of their products;

r.  failing to send "Dear Dr." letters warning of the risks of NEC, the need for surgery, and/or death based on the current scientific research and data to better guide hospitals and physicians caring for premature infants;

s.  failing to advise physicians, healthcare professionals, and parents that cow's milk-based products are not necessary to achieve growth and nutritional targets for premature infants;

t.  failing to advise physicians, healthcare providers, and parents that human milk is superior to cow's-milk-based products to support the nutrition and health of premature infants;

u.  failing to instruct or warn that an exclusive human-milk-based diet significantly decreases the risk of NEC when compared to a diet that includes cow's-milk-based products;

v.   failing to advise physicians, healthcare providers, and parents that human-milk-based products and amino-acid-based and/or hydrolyzed formulas were viable alternatives to cow's milk-based products to significantly reduce the risk of premature infants developing NEC;

w.   failing to directly warn parents of the risk that their cow's-milk-based formulas and fortifiers would cause NEC, despite knowing that parents were not being warned of the risk of NEC by their children's physicians;

x.   failing to require or recommend that hospitals and/or physicians inform parents before feeding Defendants' products to their premature babies that cow's-milk-based products significantly increase the risk of NEC, the need for surgery, and/or death;

y.   failing to provide a thorough and detailed risk-benefit analysis on the decision to feed cow's-milk-based formulas and/or fortifiers to premature infants for hospitals, doctors, and parents;

z.   failing to provide periodic or yearly safety reports;

aa.  failing to provide periodic or yearly risk-benefit analyses for use of their products;

bb.  providing warnings that were severely inadequate, vague, confusing, and provided a false sense of security because Defendants warned and instructed about other specific product uses and risks (including warnings not to microwave formula before feeding it to infants), but did not warn that cow's-milk-based formulas and fortifiers significantly increase the risk of NEC, the need for surgery, and/or death for premature infants and provide no information on how to avoid such harm; and/or

cc.  promoting their products as superior to competitive human milk-based products despite robust scientific evidence to the contrary.

163.    As a direct result of Defendants' conduct, as described herein, T.A.H. was exposed to Defendants' unreasonably dangerous infant formula and suffered from NEC and suffered severe injury.

164.    As a direct result of Defendants' conduct, as described herein, Defendants' unreasonably dangerous formulas and/or fortifiers were administered to T.A.H. causing him to develop NEC.

165.    As a direct and proximate result of Defendants' negligent conduct, Plaintiff suffered significant damages, including severe emotional distress, loss of income, and other damages.

166.    As a direct and proximate result of Defendants' conduct, as described herein, T.A.H. developed NEC.

167.    Defendants' failure to warn was deliberate because Defendants knew that if they advised physicians and healthcare providers of the extreme risks associated with feeding premature infants cow's-milk-based products, they would not have purchased such dangerous products for feeding to premature infants in hospitals, including neonatal intensive care units.

168.    Defendants' massive marketing campaigns as detailed above have had the effect of: (1) diminishing the ability of parents to intelligently resist the decision of a healthcare provider to feed cow's-milk-based products; (2) diminishing mothers' desire to breastfeed by framing it as a personal decision without health ramifications for infants, especially premature infants; (3) diminishing mothers' confidence in the capability of their bodies to provide sufficient and adequate nutrition for their premature infants without help from Defendants' products; (4) interfering with and supplanting the physician-patient relationship with respect to nutritional decision-making for newborns; (5) making it more difficult for a physician or other medical provider to persuade a mother to breastfeed; and (6) making it easier and more economically viable for hospitals to feed preemies cow's-milk-based products rather than donor milk or human-milk-derived products.

169.    As a result of the inadequacy of the warnings and the pervasive marketing suggesting the safety and necessity of Defendants' products, T.A.H. was fed Defendants' cow's-milk-based formula and fortifier products, which caused him to develop NEC.

48

170. As a result of Defendants' failures to warn in violation of state law as detailed above, T.A.H. was fed Enfamil Products in the NICU, which caused him to develop NEC.

171. Given the reprehensibility of Defendants' conduct, which was undertaken with actual malice and/or wanton and willful disregard for the safety of the vulnerable infant population, including T.A.H., who would foreseeably be harmed by Defendants' acts and omissions, the Court should assess Defendants with punitive damages under state law.

172. Defendants have failed to take corrective action after learning about how their cow's-milk-based formula and fortifier products have caused infants to develop NEC, require surgical treatment, and die. Instead, Defendants have actively concealed information about how their products cause NEC from the public and profited substantially from these actions.

173. Punitive damages are necessary to punish Defendants and deter Defendants and other massive infant-formula corporations from continuing to manufacture, market, and sell cow's-milk-based products for feeding to premature infants.

## COUNT V: PUNITIVE DAMAGES

174. Plaintiff realleges all paragraphs previous and subsequent to this paragraph as though fully set forth herein.

175. Defendants acted with actual malice in that Defendants' conduct was characterized by evil motive, ill will, an intent to injure, and an intent to defraud. Defendants' conduct was knowing, conscious, deliberate, willful, wanton, reckless, grossly negligent and outrageous and undertaken with reckless disregard for the safety of others, including Plaintiff and T.A.H.

176. Defendants had actual knowledge that their Cow's Milk-Based Products did not perform as safely as an ordinary consumer would expect when using the cow-based products in the intended and reasonably foreseeable manner. In particular, Defendants had knowledge that

their Cow's Milk-Based Products significantly increased the risk of NEC and death when used by premature infants.

177.    Despite knowledge that their Cow's Milk-Based Products significantly increased the risk of NEC and death when used by premature infants, Defendants deliberately disregarded the devastating and foreseeable harm resulting from use of their products by premature babies and continued to promote their products for use by that vulnerable group.

178.    Defendants acted with malice and deliberate disregard for the safety of others in the following ways:

a.    marketing and selling their Cow's Milk-Based Products to premature infants when they knew their products were causing NEC and death in premature infants;

b.    placing in commerce an unreasonably dangerous product with actual knowledge of the product's defects;

c.    intentionally ignoring the scientific data and studies concluding that Cow's Milk-Based Products were causing NEC and death in premature babies so that Defendants would continue to profit from the sale of their Cow's Milk-Based Products;

d.    intentionally encouraging NICUs, hospitals, and doctors to utilize different feeding strategies instead of developing an evidence-based safety plan to prevent their Cow's Milk-Based Products from causing NEC and death in premature infants;

e.    claiming their products were beneficial to the growth of extremely premature infants when they knew their Cow's Milk-Based Products were unnecessarily causing NEC and death in premature babies;

f.    intentionally withholding or obscuring from the FDA, healthcare providers, and consumers important data that showed Defendants' Cow's Milk-Based Products were causing NEC and death in premature infants; and/or

g.    deliberately choosing not to recommend or promote human-based milk for premature infants despite medical evidence that human-based milk was safer

for premature infants, and instead, continuing to promote their dangerous Cow's Milk-Based Products for premature infants because they did not have a human-based product to sell.

179.    As set forth herein, Defendants showed a complete indifference to and/or conscious disregard for the safety of others, including Plaintiff and T.A.H.

180.    Defendants' conduct as alleged herein was done with reckless disregard for human life, oppression, and malice. Defendants were fully aware of the safety risks of their Cow's Milk-Based Products, particularly the increased risk of NEC and death when used by premature infants, yet Defendants deliberately crafted their label, marketing, and promotion to mislead healthcare providers and the public into using the Cow's Milk-Based Products for premature infants.

181.    This was not done by accident or through some justifiable negligence. Rather, Defendants knew that it could turn a profit by convincing consumers that their Cow's Milk-Based Products were safe and beneficial for use by premature infants. Defendants knew that disclosure of the true risks of their Cow's Milk-Based Products would limit the amount of money Defendants would make selling such products. Defendants' objective was accomplished through a deliberate and comprehensive scheme of selective misleading research and testing, false advertising, and deceptive omissions as more fully alleged throughout this Complaint. Plaintiff was denied the right to make an informed decision about whether to use Cow's Milk-Based Products knowing the full risks attendant to using such products.

182.    Defendants knew or had reason to know a high degree of probability that their actions, set forth herein, would result in injury to consumers, such as Plaintiff and T.A.H.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

183.    For compensatory damages in an amount to be proven at trial;

184.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, loss of consortium, and other non-economic losses sustained as a result of Defendants' conduct;

185.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

186.    For exemplary and punitive damages against Defendants in an amount to be proven at trial, and sufficient to punish or deter Defendants and others from repeating the injurious conduct alleged herein;

187.    For interest as permitted by law;

188.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

189.    For such other and further relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a trial by jury on all issues triable by jury.

Dated: January 31, 2024

Respectfully submitted,

*/s/ Ellen A. Presby*
Ellen A. Presby
Yvette Ferrer
FERRER, POIROT, FELLER, DANIEL
2603 Oak Lawn, Suite 300
Dallas, Texas 75219
Tel: (214) 521-4412
Fax: (866) 513-0115
epresby@lawyerworks.com
yferrer@lawyerworks.com

**Attorneys for Plaintiff**